**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Pearlie Boyd, Alberto Camacho, Dieisha Hodges, Monic Serrano, Sienna Guerrero-Brown, Stephanie Puckett, Genna Unley, Connie Wilson, Cami McEvers, Laurie Cahill, Harmony Deflorio, Joslyn Sanders, Marsha Solmssen, and Jessica Brodiski individually and on behalf of all others similarly situated, | Case No. 0:23-cv-02668-KMM-DJF |
| Plaintiffs, | **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO TARGET CORPORATION'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT** |
| v. | |
| Target Corp., | |
| Defendant. | |

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 4

LEGAL STANDARD .................................................................................................. 8

ARGUMENT ............................................................................................................... 8

I. PLAINTIFFS MET THE SPECIFICITY REQUIREMENTS OF FED. R. CIV. P. 9(B). ................................................................................................. 8

A. Plaintiffs Alleged "What" About the Target Clean Program Was Deceptive. ............................................................................... 9

B. Plaintiffs Alleged "How" the Target Clean Program Was Deceptive. ........ 11

C. Plaintiffs Alleged "When" Target Made its Misrepresentations. ................ 12

II. PLAINTIFFS HAVE PLED ACTIONABLE MISREPRESENTATIONS AND OMISSIONS. ............................................................................ 12

A. Defendant's Motion Raises Several Issues of Fact and Disposition on the Pleadings is Inappropriate. .................................................... 14

B. The Target Clean Label was Deceptive and Could Mislead Consumers. ............................................................................ 16

1. Applying the Target Clean Label to the Identified Products Created False Representations. ........................................ 18

2. The Target Clean Label was Likely to Mislead Consumers. ........... 20

a. Target's purported definition for "Target Clean" does not negate the deceptiveness of Target's marketing. .................. 21

b. The Product's individual labels do not negate the deceptiveness of Target's "clean" claims. ............................ 24

c. "Clean" has implications beyond what Target represents. .... 27

C. Target's Greenwashing is also relevant here. ............................................ 31

D. Plaintiffs alleged Target made actionable misrepresentations and omissions. .......... 33

1. Plaintiffs alleged Target omitted material facts, which is actionable. .......... 33

a. Target omitted material facts to consumers. .......... 34

b. Target's omissions of material facts are actionable deceptive practices .......... 35

c. Special circumstances exist that triggered Target's duty to disclose all material facts related to the Target Clean Label. .......... 36

2. Target intentionally made affirmative misrepresentations and omitted material facts related to the Target Clean Label. .......... 38

3. Plaintiffs are not required to allege individual reliance. .......... 40

III. PLAINTIFFS HAVE SUFFICIENTLY PLED THEIR STATE STATUTORY CLAIMS. .......... 42

A. Plaintiffs Sufficiently Allege Causation under the Washington Consumer Protection Act. .......... 42

B. Plaintiffs Sufficiently Allege Both Fraudulent Conduct and Underlying Predicate Offenses in Violation of the California Unfair Competition Law. .......... 44

C. Plaintiffs' Alabama Deceptive Trade Practices Act and Arizona Consumer Fraud Act Claims Are Timely. .......... 45

IV. PLAINTIFFS SUFFICIENTLY ALLEGE BREACH OF EXPRESS AND IMPLIED WARRANTY CLAIMS. .......... 47

A. Plaintiffs' sufficiently alleged Target's affirmative representations, which gave rise to warranties. .......... 48

B. Plaintiffs sufficiently alleged causation. .......... 49

V. PLAINTIFFS SUFFICIENTLY ALLEGED TARGET'S UNJUST ENRICHMENT. ..... 50

CONCLUSION ..... 53

# TABLE OF AUTHORITIES

## Cases

*Ablaza v. Sanofi-Aventis U.S. LLC*,
2022 WL 19517298 (N.D. Cal. July 12, 2022) .......... 39

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) .......... 8

*Aspinall v. Phillip Morris Cos., Inc.*,
813 N.E.2d 476 (Mass. 2004) .......... 17

*Austin v. Loftsgaarden*,
675 F.2d 168 .......... 41

*Bell v. Publix Super Mkts, Inc.*,
982 F.3d 468 (7th Cir. 2020) .......... 20

*Bhatia v. 3M Co.*,
323 F. Supp. 3d 1082 (D. Minn. 2018) .......... 9, 12, 39

*Blue Buffalo Co. v. Nestle Purina Petcare Co.*,
2015 WL 3645262 (E.D. Mo. June 10, 2015) .......... 14

*Budhani v. Monster Energy Co.*,
527 F. Supp. 3d 667 (S.D.N.Y. 2021) .......... 14, 21

*Cheatham v. ADT Corp.*,
161 F. Supp. 3d 815 (D. Ariz. 2016) .......... 46, 47

*Chin v. General Mills, Inc.*,
2013 WL 2420455 (D. Minn. May 31, 2013) .......... 49

*Claybourne v. Imsland*,
414 N.W.2d 449 (Minn. Ct. App. 1987) .......... 17

*Clement v. St. Charles Nissan Inc.*,
103 S.W.3d 898 (Mo. Ct. App. 2003) .......... 35

*Cobb v. PayLease LLC*,
34 F. Supp. 3d 976 (D. Minn. 2014) .......... 50

*Devane v. L'Oreal USA, Inc.*,
2020 WL 5518484 (S.D.N.Y. Sept. 14, 2020) .......... 27

*Drobnak v. Andersen Corp.*,
561 F.3d 778 (8th Cir. 2009) .......... 9

*Dumont v. Reily*,
934 F.3d 35 (1st Cir. 2019) .......... Passim

*Force v. ITT Hartford Life Ins. & Annuity Ins. Co.*,
4 F. Supp. 2d 843 (D. Minn. 1998) .......... 35

*Frazer v. Millennium Bank, N.A.*,
2010 WL 4579799 (D. Ariz. Oct. 27, 2010) .......... 45

*Gisairo v. Lenovo (United States) Inc.*,
516 F. Supp. 3d 880 (D. Minn. 2021) .......... 52

*Gitson v. Trader Joe's Co.*,
2013 WL 5513711 (N.D. Cal. Oct. 4, 2013) .......... 27

*Goldemberg v. Johnson & Johnson Cons. Co., Inc.*,
8 F. Supp.3d 467 (S.D.N.Y. 2022) .......... 14

*Graphic Commc'ns Loc. 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*,
850 N.W.2d 682 (Minn. 2014) .......... 20, 33, 34, 35

*Grp. Health Plan, Inc. v. Philip Morris Inc.*,
621 N.W.2d 2 (Minn. 2001) .......... 41

*Hamilton v. Palm*,
621 F.3d 816 (8th Cir. 2010) .......... 14, 15

*Huff v. Pinstripes, Inc.*,
927 F. Supp. 2d 1065 (D. Minn. 2013) .......... 52

*In re 100% Grated Parmesan Cheese Mktg. & Sales Pracs. Litig.*,
275 F. Supp. 3d 910 (N.D. Ill. 2017) .......... 17

*In re Gen. Mills Glyphosate Litig.*,
2017 WL 2983877 (D. Minn. July 12, 2017) .......... 17

*In re K-tel Int'l, Inc. Sec. Litig.*,
300 F.3d 881 (8th Cir. 2002) ........................................................................ 14, 21

*In the Matter of Int'l Harvester Co.*,
104 F.T.C. 949 (F.T.C. 2008) ........................................................................ 38

*Iowa League of Cities v. E.P.A.*,
711 F.3d 844 (8th Cir. 2013) ........................................................................ 15

*Janney v. Mills*,
944 F. Supp. 2d 806 (N.D. Cal. 2013) ........................................................................ 30

*John v. Whole Foods Market Group, Inc.*,
858 F.3d 732 (2d Cir. 2017) ........................................................................ 41

*Johnson & Johnson–Merck v. Rhone–Poulenc Rorer*,
19 F.3d 125 (3d Cir. 1994) ........................................................................ 18, 20

*Johnson v. Bobcat Co.*,
175 F. Supp. 3d 1130 (D. Minn. 2016) ........................................................................ 10

*Jones v. Coty Inc.*,
362 F. Supp. 3d 1182 (S.D. Ala. Sept. 14, 2018) ........................................................................ 46

*Jones v. Orgain*,
2021 WL 4392783 (S.D.N.Y. Sept. 24, 2021) ........................................................................ 28, 29

*Jou v. Kimberly-Clark Corp.*,
2013 WL 6491158 (N.D. Cal. Dec. 10, 2013) ........................................................................ 28, 30, 31

*Keele Hair & Scalp Specialists*,
55 F.T.C. 1840 (F.T.C. 1959) ........................................................................ 38

*Khoday v. Symantec Corp.*,
858 F. Supp. 2d 1004 (D. Minn. 2012) ........................................................................ 34

*Klein v. First Edina Nat. Bank*,
293 Minn. 418 (Minn. 1972) ........................................................................ 36

*Knotts v. Nissan N. Am., Inc.*,
346 F. Supp. 3d 1310 (D. Minn. 2018) ........................................................................ 42

*Kraft, Inc. v. FTC*,
970 F.2d 311 (7th Cir. 1992)........21

*LensCrafters, Inc. v. Vision World, Inc.*,
943 F. Supp. 1481 (D. Minn. 1996)........18, 28

*Lizama v. Venus Lab's, Inc.*,
2023 WL 4198097 (E.D. Mo. June 27, 2023)........20

*Lizama v. H&M Hennes & Mauritz LP*,
2023 WL 3433957 (E.D. Mo. May 12, 2023)........27, 39

*M.H. v. Caritas Family Servs.*,
488 N.W.2d 282 (Minn. 1992)........33

*Mantikas v. Kellogg Co.*,
910 F.3d 633 (2d Cir. 2018)........25, 26

*McAteer v. Target Corp.*,
2018 WL 3597675 (D. Minn. July 26, 2018)........28, 29, 30

*McCormack v. Citibank, N.A.*,
979 F.2d 643 (8th Cir. 1992)........8

*McGregor v. Uponor, Inc*.
2010 WL 55985 (D. Minn. Jan. 4, 2010)........47, 48

*McKinniss v. Gen. Mills, Inc*.,
2007 WL 4762172 (C.D. Cal. Sept. 18, 2007)........27

*Moore v. Mars Petcare US, Inc.*,
966 F.3d 1007 (9th Cir. 2020)........26

*Moreno v. Wells Fargo Bank, N.A.*,
2019 WL 1438248 (D. Minn. Apr. 1, 2019)........52

*Morton v. Becker*,
793 F.2d 185 (8th Cir. 1986)........8

*Newell v. Randall*,
32 Minn. 171 (Minn. 1884)........37, 38

*Norwest Bank Midland v. Shinnick*,
402 N.W.2d 818 (Minn.App.1987)....................41

*Par v. Wolfe Clinic, P.C.*,
70 F.4th 441 (8th Cir. 2023)....................8

*Poole v. Benjamin Moore & Co.*,
2018 WL 2716806....................42, 43, 44

*Rydholm v. Equifax Info. Servs. LLC*,
44 F.4th 1105 (8th Cir. 2022)....................8

*ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*,
544 N.W.2d 302 (Minn. 1996)....................51, 52

*Song v. Champion Petfoods USA, Inc.*,
2020 WL 7624861 (D. Minn. Dec. 22, 2020)....................Passim

*St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis*,
262 F.3d 53 (1st Cir. 2001)....................35

*State v. Minn. Sch. of Bus., Inc.*,
935 N.W.2d 124 (Minn. 2019)....................41

*Suchanek v. Sturm Foods, Inc.*,
764 F.3d 750 (7th Cir. 2014)....................15, 17, 20, 40

*Swedeen v. Swedeen*,
270 Minn. 491 (1965)....................37

*Tomasella v. Nestle USA, Inc.*,
962 F.3d 60 (1st Cir. 2020)....................17, 34

*United States v. Bame*,
721 F.3d 1025 (8th Cir. 2013)....................51

*Ward Labs v. FTC*,
276 F.2d 952 (2nd Cir. 1960)....................38

*White v. Kroger Co.*,
2022 WL 888657 (N.D. Cal. Mar. 25, 2022)....................31

*Williams v. Gerber Identified Products Co.*,
552 F.3d 934 (9th Cir. 2008) .......... 2, 25, 26

*Workman v. Plum Inc.*,
141 F. Supp. 3d 1032 (N.D. Cal. 2015) .......... 27

*Yost v. Millhouse*,
373 N.W.2d 826 (Minn. Ct. App. 1985) .......... 34

*Zanakis-Pico v. Cutter Dodge Inc.*,
47 P.23d 1222, 1230 (Haw. 2002) .......... 35

**Statutes**

Ala. Code § 8-19-14 .......... 45
Cal. Bus. & Prof. Code § 17200 .......... 44
Minn. Stat. § 8.31 .......... 16
Minn. Stat. § 325D.43 .......... 16
Minn. Stat. § 325D.44, subd. 1 .......... 18
Minn. Stat. § 325F.68 .......... 16
Minn. Stat. § 325F.69, subd. 1 .......... 18
Minn. Stat. § 336.2-313(1) .......... 49

**Rules**

Fed. R. Civ. P. 8(d)(2)(3) .......... 52
Fed. R. Civ. P. 9(B) .......... Passim
Fed. R. Civ. P. 15(a)(2) .......... 53

**Regulations**

16 C.F.R. § 260.1 .......... 31
16 C.F.R. § 260.3 .......... 19, 32
16 C.F.R. § 260.4(c) .......... 19, 22, 32
16 C.F.R. § 260.9(b) .......... 19, 22
16 C.F.R. § 269.4(c) .......... 32

Plaintiffs Pearlie Boyd, Alberto Camacho, Dieisha Hodges, Monic Serrano, Sienna Guerrero-Brown, Stephanie Puckett, Genna Unley, Connie Wilson, Cami McEvers, Laurie Cahill, Harmony Deflorio, Joslyn Sanders, Marsha Solmssen, and Jessica Brodiski (collectively "Plaintiffs") submit this Memorandum of Law in Opposition to Defendant Target Corporation's ("Target" or "Defendant") Motion to Dismiss Plaintiffs' Complaint (ECF No. 26) ("Def. Br.").

## INTRODUCTION

Target's Motion is based largely on a single argument: in its own view, Target did nothing that misled consumers. After navigating through Defendant's smoke and mirrors, however, it is clear that Plaintiffs allege in detail the specific marketing, branding, and labeling of the Identified Products[1] alleged in the Complaint that Target used to deceive consumers. As alleged, Defendant falsely and deliberately touted the Identified Products as "clean," formulated without unwanted chemicals, better for consumers, and held to a higher standard of clean. However, the Identified Products were not "clean." Rather, they contained ingredients that are one or more of the following: (1) supposedly banned from products bearing the Target Clean label, (2) contaminated with ingredients that are

[1] "Identified Products" has the same meaning as in the Complaint and refers to: Almay Multi-Benefit Mascara, Covergirl Clean Fresh Pressed Powder, Covergirl TruBlend Matte Foundation, Maybelline Green Edition Balmy Lip Blush, Formulated with Mango Oil, Maybelline Green Edition Mega Mouse Mascara, Physicians Formula Monoi Bronzer, Matte Bronzer, Physicians Formula Magic Mosaic Bronzer Light Bronzer, Physicians Formula Murumuru Butter Believe It! Blush, Physicians Formula Powder Palette Pressed Powder, Wet n' Wild Bare Focus Tint Hydrator, Wet n' Wild Color Icon Blush, Wet n' Wild Contouring Palette, and Wet n' Wild Photo Focus Loose Setting Powder (collectively "Identified Products").

supposedly banned from the products bearing the Target Clean label, or (3) similarly harmful to consumers and the environment as those that were supposedly banned from products bearing the Target Clean label. Glossing over these plain allegations, Target asks the Court to skip discovery, expert reports, and a trial, and reject every well-pled assertion, because it declares it did not commit a deceptive act. Target's claim is contrary to Plaintiffs' allegations and is no basis to exonerate Target for its conduct at this stage.

***First,*** Plaintiffs allege Target made misrepresentations related to the Identified Products that were likely to and did deceive consumers. For example, a reasonable consumer may interpret a Target Clean Label[2] as implying the Identified Products are clean, formulated without unwanted chemicals or ingredients, and better for them than unlabeled products. That belief would be reasonable because Target expressly made those claims. As alleged, the Identified Products do not meet these standards.

Still, Target claims it could not have misled consumers because it tucked away a list of specifically excluded chemicals. That argument fails however, because some of the Identified Products contained those exact, supposedly excluded chemicals. Despite Target's claim that consumers should have double-checked its representations, consumers are not expected to inspect back labels, or ingredient lists, and can reasonably rely on prominent displays on the front of products or in store displays. *See Dumont v. Reily,* 934 F.3d 35, 41 (1st Cir. 2019) (finding a back label cannot always immunize a defendant from a more prominent, deceptive front-label); *Williams v. Gerber Identified Products Co.*,

---

[2] Defined *infra* at 3.

552 F.3d 934, 939 (9th Cir. 2008) (similar). The mere existence of an excluded ingredients list, either on the Identified Products themselves or those supposedly banned from Target Clean products, is not enough to overcome the deceptive labels and displays in Target's stores and on Target's website. Plaintiffs have sufficiently pled Target misled consumers, and their claims should proceed.

***Second,*** Target omitted material facts, including that the products bearing the Target Clean label did not actually indicate a product was clean or better for consumers because the Identified Products contained other harmful ingredients. While Target asserts consumers should have conducted their own review and research of ingredient lists and made their own independent determination of whether or not those products were "clean," the whole point of the Target Clean program, according to Target, was to do that work on the consumers' behalf. Target failed to disclose that the Identified Products may contain ingredients that pose the same risks as those purportedly excluded chemicals and thus, these products were far from "clean." Plaintiffs allege these omissions were inherently deceptive and support their fraud-based and consumer law claims.

Ultimately, Target's only defense to this litigation is that it defined the chemicals supposedly excluded through the Target Clean program, and anyone who dug deep enough could uncover the truth. That is insufficient to dismiss Plaintiffs' claims that the Target Clean Label, and the representations Target made in conjunction with that label, were deceptive at the pleadings stage. The Court should deny Defendant's Motion.

## BACKGROUND

Modern consumers are demanding products that are cleaner for themselves and the environment, which includes the products' materials, manufacture, use, and disposal. Compl. ¶¶ 41-42. To that end, consumers have poured billions of dollars into the clean beauty market, looking for and buying products that are safer, more sustainable, and cleaner. *Id.* ¶ 62. In this consumer environment, companies gain a competitive advantage by offering "green" or "seemingly green" products to satisfy consumer preferences. *Id.* ¶ 13. The Target Clean program offers seemingly cleaner products as a business strategy to get customers in the door, rather than informing consumers about whether the products they purchase are actually "clean,"

Target launched Target Clean in 2019. *Id.* ¶ 105. The Target Clean icon is a bright, highly visible green hexagon icon—the type of icon associated with sustainability and a reduced environmental impact. *Id.* ¶ 47(g). Target attached the icon to products in stores and online at www.target.com, to let consumers know the labeled product was supposedly formulated without a group of commonly unwanted chemicals ("Target Clean Label"). *Id.* Target represented that its Target Clean Label was applied to beauty products that meet its "higher standard of clean" or were otherwise "Clean Beauty", helping guests find "better-for-you product options." *Id.* ¶¶ 105, 107, 109.

Defendant further represented, on its website, that Target Clean stamped beauty products are formulated without chemicals of concern in the following chemical groups: phthalates, propyl- & butyl-parabens, formaldehyde donors, musks, nonylphenol ethoxylates ethanolamines, glycol ethers, siloxanes, perfluorinated substances (PFAS), and

more, including Hydroquinone (collectively, "Banned Ingredients"). *Id.* ¶ 109. Each of these "chemicals of concern," as Target has labeled them, has risks associated with human safety and health and the environment. For example:

(1) Phthalates are **endocrine (hormone) disruptors**, which are linked to immune, reproductive, and developmental health issues and have also been linked to **developmental and reproductive toxicity**. *Id.* ¶¶ 4 n. 6, 89-90. Phthalates are on the State of California Environmental Protection Agency Office of Environmental Health Hazard Assessment Safe Drinking Water and Toxic Enforcement Act of 1986's list of Chemicals Known to the State to Cause Cancer or Reproductive Toxicity **(California Proposition-65),** *id*;

(2) Propyl- & butyl-parabens are parabens (preservatives) and **endocrine disruptors**, *id.* ¶¶ 4;

(3) Formaldehyde Donors are known **carcinogens, or known to lead to cancer,** and is a **common allergen**, *id.* ¶¶ 4, 91, 93, 101;

(4) Nonylphenol Ethoxylates Ethanolamines are detergent like substances that **negatively impact marine life**, *id.* ¶ 4;

(5) Siloxanes are **endocrine disrupters**, *id.* ¶ 89-90;

(6) PFAS are a group of 15,000 chemicals that may lead to **adverse health outcomes** including decreased fertility or increased high blood pressure in pregnant women, increased risk of cancer and interference with natural hormones and also **pose a substantial risk to the environment**. *id.* ¶¶ 74-87, 90.

Notably, some the Banned Ingredients are harmful at much smaller levels than Target requires to qualify for the Target Clean Label. *Id.* ¶ 80. Indeed,

> The current Environmental Protection Agency's health advisory for PFAS limits PFAS for safe consumption to just 70 nanograms per liter.48 To put this in perspective, Target purports that the ingredients banned from Target Clean Labeled products must be < 100 part per million, or the equivalent of 100,000,000 nanograms per liter. Said another way, Defendant uses its Target Clean Label to independently designate products as "clean" that may contain over 1.4 million times more nanograms per liter of harmful PFAS chemicals than is recommended by the EPA. This is true despite the research being clear that PFAS can be harmful at a very, very low concentration.

*Id.*

Plaintiffs alleged the following Identified Products at issue in this litigation as either directly violating Target's parameters to receive a Target Clean Label or as otherwise misleadingly labeled as "clean," formulated without "unwanted" ingredients, better for consumers, and held to a higher standard of clean:

| **Product Name** | **Risks Associated with Ingredients in the Identified Products** [3] |
|---|---|
| **Almay Multi-Benefit Mascara,** *id.* ¶¶ 117-21 | 1. Allergen<br>2. Endocrine disruptor<br>3. Strong affinity to PFAS |
| **Covergirl Clean Fresh Pressed Powder,** *id.* ¶¶ 154-58 | 1. Strong affinity to PFAS<br>2. Human carcinogen (higher risk in powders) |
| **Covergirl TruBlend Matte Foundation,** *id.* ¶¶ 181-185 | 1. Human carcinogen (higher risk in powders)<br>2. Environmental toxin<br>3. California Proposition-65 |
| **Maybelline Green Edition Balmy Lip Blush, Formulated with Mango Oil,** *id.* ¶¶ 187-191 | 1. Environmental Toxin<br>2. Allergen<br>3. Endocrine disruptor<br>4. Human carcinogen<br>5. Toxin to reproductive development |

[3] This is not an exhaustive list of risk, but rather a list of risks similar to those posed by the Banned Ingredients.

| Product Name | Risks Associated with Ingredients in the Identified Products [3] |
|---|---|
| **Maybelline Green Edition Mega Mouse Mascara,** *id.* ¶¶ 192-195 | 1. Environmental toxin<br>2. Strong affinity to PFAS |
| **Physicians Formula Monoi Bronzer, Matte Bronzer**, *id.* ¶¶ 123-127 | 1. Human carcinogen<br>2. Allergen<br>3. Impact on reproductive system |
| **Physicians Formula Magic Mosaic Bronzer Light Bronzer,** *id.* ¶¶ 166-173 | 1. Human carcinogen<br>2. Environmental toxin<br>3. Impacts on fertility<br>4. Endocrine disruptor<br>5. Allergen<br>6. Strong affinity to PFAS |
| **Physicians Formula Murumuru Butter Believe It! Blush,** *id.* ¶¶ 160-164 | 1. Human carcinogen<br>2. Allergen<br>3. Strong affinity to PFAS<br>4. California Proposition-65 |
| **Physicians Formula Powder Palette Pressed Powder,** *id.* ¶¶ 175-179 | 1. Human carcinogen (higher risk in powder)<br>2. Strong affinity to PFAS<br>3. California Proposition-65 List |
| **Wet n' Wild Bare Focus Tint Hydrator**, *id.* ¶¶ 142-146 | 1. Impacts fertility<br>2. Associated with PFAS<br>3. Human carcinogen |
| **Wet n' Wild Color Icon Blush**, *id.* ¶¶ 135-140 | 1. Human Carcinogen<br>2. Linked to PFAS |
| **Wet n' Wild Megaglo Contouring Palette,** *id.* ¶¶ 148-152 | 1. Human carcinogen<br>2. Strong affinity to PFAS |
| **Wet n' Wild Photo Focus Loose Setting,** *id.* ¶¶ 129-133 | 1. Human carcinogen<br>2. Strong affinity to PFAS |

As Plaintiffs allege, consumers considered the Target Clean Label on the Identified Products in their purchasing decisions and would not have purchased the Identified Products, or would have paid less for them, had they known the Identified Products contained ingredients at odds with any claim that they were "clean", let alone designated

"Target Clean" by a major U.S. corporation Plaintiffs trusted. Compl. ¶¶ 21-34. Because the Identified Products contain unwanted ingredients that have a negative impact on human health and the environment, Plaintiffs have sufficiently alleged Target misled consumers and violated state and common laws.

## LEGAL STANDARD

The court must "accept all well-pleaded allegations of the complaint as true, and all reasonable inferences therefrom must be construed favorably to the pleader." *McCormack v. Citibank, N.A.*, 979 F.2d 643, 646 (8th Cir. 1992) (*citing Morton v. Becker,* 793 F.2d 185, 187 (8th Cir. 1986)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1108 (8th Cir. 2022) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). A plausible claim for relief 'allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 446 (8th Cir. 2023) (*quoting Ashcroft*, 556 U.S. at 662).

## ARGUMENT

### I. PLAINTIFFS MET THE SPECIFICITY REQUIREMENTS OF FED. R. CIV. P. 9(B).

Defendant contends Plaintiffs have not sufficiently pled the "who, what, where, when, and how," but only substantively critiques Plaintiffs' complaint as lacking the

"what," "when," and "how."[4] These arguments ignore Plaintiffs' highly specific allegations.. For fraud-based allegations, "Rule 9(b) requires that circumstances constituting fraud be pleaded with particularity," meaning the "complaint must allege such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Drobnak v. Andersen Corp.*, 561 F.3d 778, 783 (8th Cir. 2009). In other words, a plaintiff must plead the "who, what, where, when, and how" of the alleged fraud. *Id.* "The level of particularity depends upon the nature of the case and the relationship between the parties." *Bhatia v. 3M Co.*, 323 F. Supp. 3d 1082, 1092 (D. Minn. 2018). Here, Plaintiffs have alleged with particularity how Defendant's Target Clean marketing program is false and deceptive to consumers.

### A. Plaintiffs Alleged "What" About the Target Clean Program Was Deceptive.

Plaintiffs have specifically identified the contents of Defendant's false and deceptive representations—the "what." Plaintiffs alleged the Target Clean Label, a bright green hexagonal icon attached to the Identified Products and others, purports to represent to consumers that Target vetted the products to ensure they were "formulated without a group of commonly unwanted chemicals that can be found in products [consumers] use regularly." Compl. ¶¶ 3, 105, 109. Plaintiffs allege the Target Clean Label indicates that

[4] Though not required under Rule 9(b), Defendant also critiques Plaintiffs' allegations as lacking the "why"; however, Plaintiffs read this critique as directed instead at "how" Plaintiffs were misled. The "why" is straightforward and pervasively alleged: so Target could make money.

products bearing this seal have none of the Banned Ingredients, which are known to have adverse impacts on human health and the environment. *Id.* ¶ 4. Plaintiffs included pictures of Target's advertisements displayed in Target stores or on its website that state that the Target Clean Label is intended to indicate a product is "clean" and formulated without unwanted ingredients. *Id.*. ¶¶ 5, 105, 109; *see also Johnson v. Bobcat Co.*, 175 F. Supp. 3d 1130, 1145–46 (D. Minn. 2016) (finding plaintiff had met the Rule 9(b) standard where plaintiff identified content from defendant's website alleged to have contained misrepresentations and observing that Rule 9(b) does not require plaintiffs to allege specific webpages visited).

Plaintiffs further allege the Target Clean seal appears next to products identified as "clean" without any clarification, disclaimer, or explanation of what ingredients are excluded or how the product is "clean." Compl. ¶ 8. Plaintiffs even provided specific examples of products labeled as "clean" that, in reality, contained the Banned Ingredients. *Id.* ¶¶ 8–9. Plaintiffs also described that the Identified Products, despite carrying the Target Clean Label, were not actually "clean" or free from unwanted or harmful ingredients at all and allege how each of the Identified Products were not actually "clean." *Id.* ¶¶ 16, 116–96. Each Plaintiff alleged that the Target Clean Label impacted their decision to purchase one or more of the identified products, along with where they made their purchases, what product they purchased, and whether the purchase was made in-store or online. *Id.* ¶¶ 21–35. Thus, Plaintiffs pled with specificity the contents of Defendant's false and deceptive representations and omissions.

### B. Plaintiffs Alleged "How" the Target Clean Program Was Deceptive.

Plaintiffs also alleged with specificity "how" Defendant's Target Clean program misled Plaintiffs and consumers. Plaintiffs alleged that Defendant's Target Clean Label, displayed prominently in stores and online, creates the presumption that: (1) products marked 'Target Clean' do not contain any of the Banned Ingredients, even though some of the products do contain these exact ingredients; (2) products formulated without the Banned Ingredients are in fact clean despite the presence of other equally or more harmful ingredients; and (3) the presence of these ingredients at <100 ppm is a safe amount for consumer exposure, even though exposure to some of these ingredients and other forever chemicals are dangerous at much smaller concentrations. *Id.* ¶ 5. Plaintiffs specifically allege "how" the Target violated each of these. *See, e.g.,* ¶¶ 6, 8-9 (alleging specific examples violating (1) and (2) above); ¶ 80 (alleging specific examples of violating (3) above).

Plaintiffs also alleged a litany of specific products bearing the Target Clean label that Plaintiffs purchased but contained Banned Ingredients, contained harmful ingredients not banned by Target, contain Banned ingredients in harmful quantities, or some combination of the three. *Id.* ¶¶ 116–96. In short, as alleged, a reasonable consumer who saw the Target Clean Label would have believed the product to be clean and free of unwanted, harmful ingredients, even though the product not only contained the allegedly Banned Ingredients but also other harmful chemicals which Target has nonetheless marketed as "clean." *Id.* ¶¶ 8–9, 13–14, 80, 87. Plaintiffs pled with specificity and particularity "how" the Target Clean program misled Plaintiffs and other consumers.

### C. Plaintiffs Alleged "When" Target Made its Misrepresentations.

Plaintiffs also alleged the time period during which Defendant's deceptive and misleading practices took place, including that Target's misrepresentations are ongoing. Where a plaintiff alleges a "systematic practice of fraudulent activities or representations over an extended period of time, the plaintiff need not allege the specific details of every fraudulent act but must still plead some representative examples of the allegedly fraudulent conduct with sufficient particularity." *Bhatia*, 323 F. Supp. 3d at 1092. Here, Plaintiffs have identified the time period during which Defendant committed the challenged conduct, alleging that Defendant launched the Target Clean program in 2019 and expanded the program to beauty products months later. Compl. ¶ 3. Several Plaintiffs further pled when they made their purchases. *Id*. ¶¶ 21–24, 27. This information is sufficient to put Defendant on notice of the deceptive and misleading representations and the time period during which they were made, such that Defendant is more than able to respond to Plaintiffs' allegations (and has). *Bhatia*, 323 F. Supp. 3d at 1092.

Plaintiffs pled with specificity and particularity the "who, what, where, when, and how" required by Rule 9(b) and the Court should deny Defendant's Motion.

## II. PLAINTIFFS HAVE PLED ACTIONABLE MISREPRESENTATIONS AND OMISSIONS.

Defendant argues that Plaintiffs could not have been misled because it defined the criteria for a Target Clean Label, and the Identified Products supposedly conformed to that definition. Def. Br. 12. However, Defendant ignores Plaintiffs' allegations, which for example, include claims related to products, like the Physicians Mosaic Bronzer, that do,

or did at some time, expressly contain Banned Ingredients. *See* Compl. ¶¶ 166, 170 (alleging the manufacturer provides three variations of ingredient lists for the product and each one contains a Banned Ingredient).

Target's argument also fails to acknowledge Plaintiffs' allegations that Target purposefully sought to induce consumers to rely on the Target Clean Label as a means to simplify shopping, when in reality, the Target Clean Label excludes only a narrow subset of unwanted or harmful ingredients. Thus, Target caused consumers to wrongly believe the label provided an adequate basis for finding "clean" Identified Products, but it did not. As such, Plaintiffs sufficiently pled that Target marketed and labeled the Identified Products in a manner that was deceptive and misleading to consumers, violating each of the consumer protection statutes alleged, breaching express and implied warranties, and constituting fraud. *Id*. ¶ 196.

Target's disagreement with Plaintiffs' allegations is not a valid basis to dismiss Plaintiffs' well-pled Complaint. Indeed, Target raises several issues of fact, which are not appropriate for disposition on a motion to dismiss. Notwithstanding, Plaintiffs sufficiently pled: (1) Target misled reasonable consumers by applying the Target Clean Label to the Identified Products; (2) the Federal Trade Commission's ("FTC") guidance in the Green Guides related to deceptive marketing align with and support Plaintiffs' claims; and (3) Target's affirmative misrepresentations and material omissions are actionable.

### A. Defendant's Motion Raises Several Issues of Fact and Disposition on the Pleadings is Inappropriate.

Target asserts the Court should find as a matter of law that its representations as part of the Target Clean program and with respect to the Identified Products were not deceptive and ignore the fact that each of the Identified Products contain problematic ingredients. Def. Br. at 13. This is improper. "Generally, the issue of whether a public statement is misleading is a mixed question of law and fact for the jury." *In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d 881, 897 (8th Cir. 2002); *see also Hamilton v. Palm*, 621 F.3d 816, 817 (8th Cir. 2010) (finding the court's function at this stage is to determine whether a complaint "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face."); *Dumont*, 934 F.3d at 41 ("[W]e think it best that six jurors, rather than three judges, decide on a full record whether the challenged label 'has the capacity to mislead' reasonably acting, hazelnut-loving consumers."); *Blue Buffalo Co. v. Nestle Purina Petcare Co.,* No. 4:15 CV 384 RWS, 2015 WL 3645262, at *7 (E.D. Mo. June 10, 2015) (holding that where allegations of misleading packaging depend on what a reasonable consumer would understand, extrinsic evidence of consumer impact must be considered and resolution on a motion to dismiss is therefore improper); *Budhani v. Monster Energy Co.,* 527 F. Supp. 3d 667, 676 (S.D.N.Y. 2021) (whether an allegedly deceptive advertisement would have misled a reasonable consumer "is generally a question of fact not suited for resolution at the motion to dismiss stage," particularly if it has been pleaded that reasonable consumers "could be misled" (cleaned up)); *Goldemberg v. Johnson & Johnson Cons. Co., Inc.,* 8 F. Supp.3d 467, 480 (S.D.N.Y. 2022) (denying

motion to dismiss and explaining that the court could not determine, on a Rule 12 motion, that packaging and ingredient lists would not mislead a reasonable consumer).

The Court's function at this stage is to determine whether the Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face." *Hamilton,* 621 F.3d 817; *see also Iowa League of Cities v. E.P.A.,* 711 F.3d 844, 869 (8th Cir. 2013) (holding that, at the pleading stage, a petitioner can move forward with "general factual allegations of injury…" (citation omitted)). The issue in reviewing the sufficiency of the Complaint is not whether Plaintiffs will prevail, but whether the Plaintiffs' allegations are plausible such that they are entitled to offer further evidence to support their claims.

Here, Target's arguments rely, almost exclusively, on the factual contention that consumers could not have been misled or confused by its use of the Target Clean Label because Target Clean was defined as excluding only the Banned Ingredients. Def. Br. 13, 21. However, Plaintiffs have plausibly pled that the Target Clean Label and associated representations were false or misleading because they had the capacity to and did confuse consumers. Compl. ¶¶ 247(d), 353, 373(d); *see also Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 762 (7th Cir. 2014) (finding that while plaintiff correctly understood the definition of words on the coffee package, this did not mean she could not still be deceived, and determining whether deception occurred was better suited for a jury).

As alleged, Target defined "Target Clean", but also made misleading representations in conjunction with the Target Clean Label, including that the Identified Products were "clean," formulated without "unwanted" ingredients and were "better for"

consumers. Compl. ¶¶ 105, 107. Target also represented that Target Clean products were held to a "higher standard" of clean. *Id.* ¶ 105. Plaintiffs, however, alleged that the Identified Products were not clean, contained unwanted ingredients, and were not inherently better for consumers than products not marked Target Clean. *Id.* ¶¶ 1, 119, 124, 131, 137, 143, 149, 155, 161, 167, 176, 182, 188, 193, 221. It is therefore plausible that Target's application of the Target Clean Label to the Identified Products could confuse or mislead consumers, regardless of whether Target defined what Target Clean means in fine print. Whether Target's misrepresentations related to the Identified Products were false and misleading, thereby causing consumer confusion, should not be decided by the Court on a motion to dismiss, and thus the bulk of Defendant's arguments (which simply disagree with Plaintiffs' allegations) should be unpersuasive factual disputes. Defendant's Motion should be denied to the extent it requires the Court to find as a matter of law that consumers could not have been misled or confused by the Target Clean Label.

**B. The Target Clean Label was Deceptive and Could Mislead Consumers.**

Plaintiffs also alleged that Plaintiffs' claims could mislead consumers, as required by: (1) their claims under Minnesota's consumer protection laws, including the Minnesota Consumer Fraud Act, Minn. Stat. §§ 325F.68, *et seq*. and Minn. Stat. §§ 8.31, *et seq.* ("MCFA"), Minnesota Uniform Deceptive Trade Practices Act, Minn. Stat. §§ 325D.43, *et seq*., ("MDUTPA"); (2) their claims under several other state consumer protection laws; and (3) their common law claims for fraud and negligent misrepresentation.

For these claims, Plaintiffs must plausibly allege that the Target Clean Label, and the misrepresentations and omissions Target made in connection with the label, *could*

deceive a reasonable consumer. *Song v. Champion Petfoods USA, Inc.,* No. 18-CV-3205 (PJS/KMM), 2020 WL 7624861, at *3 (D. Minn. Dec. 22, 2020), *aff'd,,* 27 F.4th 1339 (8th Cir. 2022) (*citing In re 100% Grated Parmesan Cheese Mktg. & Sales Pracs. Litig.,* 275 F. Supp. 3d 910, 920 (N.D. Ill. 2017)); *see also See Claybourne v. Imsland,* 414 N.W.2d 449, 451 (Minn. Ct. App. 1987) (considering the MUDTPA and finding "[t]he mere likelihood of such confusion is sufficient."); *In re Gen. Mills Glyphosate Litig.*, No. 16-2869 (MJD/BRT), 2017 WL 2983877, at *5–6 (D. Minn. July 12, 2017) (applying a "reasonable consumer" standard to claims under the MUTPA, MDTPA, and MPCFA); *Tomasella v. Nestle USA, Inc.*, 962 F.3d 60, 72 (1st Cir. 2020) ("An act or practice is deceptive if it "has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (*i.e.,* to entice a reasonable consumer to purchase the product.") (*quoting Aspinall v. Phillip Morris Cos., Inc.*, 813 N.E.2d 476, 491 (Mass. 2004)); *Suchanek.*, 764 F.3d at 756 (finding "[a]ll applicable state consumer protection laws require proof that a statement is either (1) literally false, *or* (2) likely to mislead (either through statement or omission) a reasonable consumer." (emphasis added)).

Plaintiffs' allegations satisfy this requirement and Defendant's Motion should be denied. Specifically, Plaintiffs allege applying the Target Clean Label was literally false and likely to deceive reasonable consumers.

**1. Applying the Target Clean Label to the Identified Products Created False Representations.**

Plaintiffs alleged that marketing the Identified Products as "Target Clean," formulated without "commonly unwanted" ingredients, "better-for" consumers and held to Target's "higher standard of clean" was false. Compl. ¶ 2, 16, 105, 107, 111-12, 196, 207-09, 213-15, 240-42, 248-50, 257, 265-67, 281-83. To demonstrate a false representation, a plaintiff need only show the representation had the capacity to deceive, regardless of "whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69, subd. 1; *see also* Minn. Stat. §325D.44, subd. 1 ("A person engages in a deceptive trade practice when … the person… represents that goods or services have… characteristics.. [or] benefits … that they do not have."). The determination of falsity "rests on an analysis of the message of the advertising context." *LensCrafters, Inc. v. Vision World, Inc.,* 943 F. Supp. 1481, 1488 (D. Minn. 1996). When advertising is "literally false," the court may grant relief on this finding alone, without considering whether the consuming public was misled. *Id.* (*citing Johnson & Johnson–Merck v. Rhone–Poulenc Rorer,* 19 F.3d 125, 129 (3d Cir. 1994)). Plaintiffs allege that here.

Plaintiffs expressly alleged some of the Identified Products contained ingredients that were on the Banned Ingredient List or may have been contaminated by the Banned Ingredients. *See* Compl. ¶¶ 166, 168, 170-72 (collectively alleging the Physicians Mosaic Bronzer contains Propylparaben, which is on the Banned Ingredient List), ¶ 119 (Almay Mascara has a contamination risk with Hydroquinone), ¶ 126 (Physicians Monoi Bronzer

has a contamination risk with Hydroquinone).[5] [6] Thus, Plaintiffs alleged the Identified Products included ingredients Target claimed were excluded from the Target Clean program. Applying the Target Clean Label to these Identified Products was literally false on its face.

Additionally, Plaintiffs allege Target's promise that the Identified Products excluded the Banned Ingredients and were "clean" and formulated without "unwanted" chemicals were also false. Contrary to those claims, Plaintiffs allege all the Identified Products contained ingredients that pose other risks—meaning they were not clean or formulated without unwanted ingredients—and they were not "clean" at all. *Id.* ¶¶ 9, 59-60, 120, 125, 132, 138, 144, 150, 156, 162, 168, 177, 183, 189, 194-196. This conduct has the capacity to deceive consumers, even where none of the Banned Ingredients were present in the product because it contained other unclean chemicals. *Id.* ¶ 52(g); *see also* C.F.R. 16 § 260.3; 16 C.F.R. § 260.9(b) (marketing claims are deceptive where product contains substances that pose the same risks as substances intentionally excluded); 16 C.F.R. § 260.4(c). Therefore, because Defendant's representations were false, Plaintiffs established the Target Clean label was misleading. The Court should deny Defendant's Motion, and

---

[6] Target argues that the Physicians Mosaic Bronzer does not contain propylparaben. This is a fact issue. But, notably, Plaintiffs also alleged ingredient lists from the product's manufacturer, all of which include propylparaben. Compl. ¶¶ 170-172. Moreover, rather than correct the ingredient list, Target removed the Target Clean Label from the Physicians Mosaic Bronzer after receiving Plaintiffs' Complaint. *Id.*

the analysis could stop here. *See Johnson*, 19 F.3d at 129 (finding relief can be appropriate in some instances on falsity grounds alone).

### 2. The Target Clean Label was Likely to Mislead Consumers.

In addition to alleging Target's demonstrably false claims, Plaintiffs also sufficiently pled that Target's misrepresentations and omissions were likely to mislead consumers. A statement is deceptive if it creates the likelihood of deception or has the capacity to deceive. *Graphic Commc'ns Loc. 1B Health & Welfare Fund "A" v. CVS Caremark Corp.,* 850 N.W.2d 682, 695 (Minn. 2014) (finding a deceptive statement to be one that "tend[s] to deceive or mislead a person"); *see also Lizama v. Venus Lab's, Inc.,* No. 4:22-CV-841 RLW, 2023 WL 4198097, at *11 (E.D. Mo. June 27, 2023) (holding plaintiff "sufficiently alleged that a reasonable consumer is likely to be misled when a label states that the product is 'non-toxic,' but it contains ingredients that are alleged to be toxic"); *Dumont*, 934 F.3d at 40.

In fact, even a true statement can support a claim for deception if the statement creates a false impression. *See Bell v. Publix Super Mkts, Inc.*, 982 F.3d 468, 479 (7th Cir. 2020); *Suchanek*, 764 F.3d at 761–62 (deceptive-practices claim "may be satisfied by proof that a statement is likely to mislead a reasonable consumer, even if the statement is literally true"). Plaintiffs established—at a minimum—that applying the Target Clean Label to the Identified Products had the capacity to deceive consumers. Indeed, Plaintiffs allege consumers and the Plaintiffs were likely to be, and actually were, misled by Defendant's statements because: (1) Target's purported definition for "Target Clean" and the related Banned Ingredient list do not negate the deceptiveness of Target's "clean" claims; (2) the

Identified Products labels do not negate the deceptiveness of Target's "clean" claims; and (3) labeling a product "Clean" has implications beyond what Target represents.[7]

**a. *Target's purported definition for "Target Clean" does not negate the deceptiveness of Target's marketing.***

Target argues its Target Clean Label is not deceptive because it defines the criteria for a product to receive a Target Clean Label and that it makes the Banned Ingredients list publicly available. Def. Br. 13. One problem, however, is the availability of this list is disputed. Plaintiffs allege that information about the Banned Ingredients was not readily available to consumers. Compl. ¶¶ 8-9. The Court is not required to (and should not) resolve this factual dispute on a motion to dismiss. *See In re K-tel Int'l, Inc. Sec. Litig.,* 300 F.3d at 897; *Budhani*, 527 F. Supp. 3d at 676; *Kraft, Inc. v. FTC*, 970 F.2d 311 (7th Cir. 1992) ("[T]he determination [] whether an ad has a tendency to deceive is an impressionistic one more closely akin to a finding of fact than a conclusion of law.").

Indeed, Target claims the Banned Ingredients list is available both in-store and online. *Id.* at 13-14. Plaintiffs sufficiently alleged, however, that the list and criteria for a Target Clean Label are not presented to consumers at all. Compl. ¶¶ 8-9. In some cases, the Identified Products appear to be simply stamped as "clean" without any further explanation or qualifications. *Id*. The fact that Target has a Banned Ingredients list linked to the Target Clean Label means nothing if it fails to adequately present that list to

---

[7] Defendant also argues Plaintiffs have not described the environmental impact of the Target Clean program. Def. Br. 21-22. However, Plaintiffs have clearly alleged they thought they were buying "clean" products, which can have human health connotations and environmental ones. Compl., ¶¶ 14-15.

consumers. Thus, how and when the Banned Ingredients List is presented to consumers is a fact issue ripe for discovery.

Nevertheless, even if the Target Clean Label is available to consumers and true as it relates to the Banned Ingredients list (which Plaintiffs contest), Target still misled consumers. It is deceptive to misrepresent, directly or by implication, that a product is free from ingredients, when the product contains other ingredients that pose the same or similar risks. Compl. ¶ 52(g) (*citing* 16 C.F.R. § 260.9(b)); *see also* 16 C.F.R. § 260.4(c) (mandating that companies should not imply that any specific benefit is significant if it is in fact negligible). Target deceptively marketed the Identified Products as clean even though they contained ingredients that posed the same or similar risks as the Banned Ingredients, and that was deceptive and misleading to consumers.

The Banned Ingredients include chemicals that pose risks to human health and the environment, including that they are, *inter alia*, known human carcinogens, endocrine disruptors linked to immune, reproductive, and developmental health issues, skin irritants and allergens, and negatively impact the environment. Compl. ¶¶ 4, 75-76. Plaintiffs allege there are ingredients in the Identified Products that present these same risks, notwithstanding the presence of any Banned Ingredients. *Id.* ¶¶ 119-20, 124-25, 131-32, 137-38, 143-44, 149-50, 155-56, 161-62, 167-68, 176-77, 182-83, 188-89, 193-94. Therefore, it was deceptive for Target to imply that the Identified Products were "Target Clean" because they excluded the Banned Ingredients when similar were present from other ingredients.

Additionally, Target intended to make the Target Clean Label a widespread symbol of health and environmental safety and used it to imply that marked products were better for consumers. This is apparent through Target's express representations about the Target Clean program, which Plaintiffs amply allege. *See* Compl. ¶ 107 ("This framework is designed to take the complications out of finding better-for-you product options."), ¶ 105 ("Look for the Target Clean symbol in store and online to find brands that meet our higher standard of clean."). Target, in fact, used the green, hexagonal symbol where "clean" was the only word displayed and it was in big bold letters. *Id.* ¶¶ 3, 105. The green hexagonal symbol is traditionally used by companies looking to imply recyclability, biodegradability, composability, sustainability, and a reduced environmental impact. *Id.* ¶ 42(g). Thus, even with Target's "fine print" definition for its Target Clean Label, the label was still likely to mislead consumers.

Defendant relies heavily on *Song v. Champion Petfoods* for the proposition that Plaintiffs' claims are premised on an "implausible interpretation of a packaging statement" because the Target Clean Label *only* implies that the Products are free from a narrow subset of chemicals. Def. Br. 14. In *Song*, however, defendant represented on its dog food packaging that the food was "biologically appropriate," made from "fresh regional ingredients," and "nourish[ed] as nature intended." 2020 WL 7624861, at *1. The court, however, held those representations could not plausibly imply to consumers that the dog food was specifically free from heavy metals, BPA, pentobarbital, and non-fresh, non-regional ingredients. *Id.* at *5–11. In other words, the representations in *Song* were

unrelated to the presence or absence of the specific ingredients the *Song* plaintiffs challenged. This reasoning is not applicable to the present case.

Here, Target supposedly excluded certain ingredients from its Target Clean program that were associated with certain known risks to human health and the environment. Because those categories of ingredients were excluded, Target marketed the products as "clean." Yet, those same products marked "clean" contained either the supposedly Banned Ingredients or other ingredients that posed similar unwanted risks. This was misleading to consumers because the label proclaimed to exclude categories of documents that were actually present in the products, unlike in *Song* where the absence of certain unsafe chemicals said nothing about the presence of other certain allegedly unsafe chemicals.

Said another way, the present case would be similar to *Song* if the dog food packaging there stated it was free from unwanted heavy metals and clean for dogs, defendant defined heavy metals to include cadmium and mercury, and the defendant then went on to sell dog food products that contained lead and others that sold cadmium and mercury. Under this fact pattern, it would be undeniable under the *Song* court's ruling that defendant there, like Target here, acted deceptively in a way that was likely to mislead consumers.

**b. *The Product's individual labels do not negate the deceptiveness of Target's "clean" claims.***

Target claims a second "Get Out of Jail Free" card by pointing to the ingredients listed on each Product. Target claims this neutralizes *ipso facto* any claims proffered by the Target Clean program. Def. Br. 17. Target's argument fails. *See Dumont*, 934 F.3d at

41 (considering multiple "reasonable" interpretations of a coffee label); *Mantikas v. Kellogg Co.*, 910 F.3d 633, 638-39 (2d Cir. 2018); *Williams,* 552 F.3d at 939. A reasonable consumer could be misled by the Target Clean Label even if the individual Products' labels disclosed every ingredient in the Products. Indeed, as several courts have found, the fine print on the back label of the Products, where consumers could read a full ingredient list, does not immunize a defendant for a more prominent, deceptive advertising claim. *Id.*

For example, in *Dumont*, the First Circuit held a jury needed to decide whether a consumer was reasonable in interpreting a coffee label because:

> [P]erhaps a reasonable consumer would find in the product name sufficient assurance so as to see no need to search the fine print on the back of the package, much like one might easily buy a hazelnut cake without studying the ingredients list to confirm that the cake actually contains some hazelnut…Our dissenting colleague envisions a more erudite reader of labels, tipped off by the accent grave on the word "crème," and armed perhaps with several dictionaries, a bit like a federal judge reading a statute. We are less confident that "common parlance" would exhibit such linguistic precision. Indeed, we confess that one of us thought "crème" was a fancy word for cream…

*Id.* at *40-41. In *Dumont*, the court was not convinced that consumers would evaluate the back label with the concern necessary to understand that there was no hazelnut in the product and even if they did, may be confused by certain terms used on the label, like crème. *Id.* *Dumont* is analogous to this case, where consumers may not have looked (or been dissuaded to look) at the back label of the Identified Products, assured by the prominent Target Clean Label that the Products were clean. Even if they did, they may not readily know the harmful effects of the other, non-Banned Ingredients.

Similarly, in *Williams*, the Ninth Circuit held:

> We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box… Instead, reasonable consumers expect that the ingredient list contains more detailed information about the product that confirms other representations on the packaging.

552 F.3d at 930-40; *accord Mantikas*, 910 F.3d at 637 ("We conclude that a reasonable consumer should not be expected to consult . . . the side of the box to correct misleading information set forth in large bold type on the front of the box."). Thus, a plaintiff's claim is not defeated at the pleading stage where, as here, a label of ingredients on the back of a product conflicts with, rather than confirms, a prominent label on the front of a product. *See Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1017 (9th Cir. 2020) ("If, however, a back label ingredients list … conflicts with, rather than confirms, a front label, the plaintiff's claim is not defeated.") (internal citations omitted).

Target also touted the Target Clean Label as a time saving tool that consumers could use to avoid doing their own product research. Under *Dumont* and *Williams*, consumers need not confirm a prominent label, displayed by a trusted vendor, by examining the fine print on the back of the products' labels. 934 F.3d at 41; 552 F.3d at 939-40. Nor *should* consumers be required to scour the product labels to evaluate whether Target's claims were accurate, especially when Target promised its Target Clean program did the work of evaluating product safety on behalf of consumers. *See, e.g.,* Compl. ¶¶ 106-07. In other words, consumers were justified believing that the Target Clean Label and the manufacturers' labels consistently represented the Identified Products, rather than taking the risk the labels contradicted each other. Therefore, the Court should reject Target's

arguments that the Identified Products' labels do anything to correct its deceptive application of the Target Clean Label or resolve Target's liability at the pleadings stage [8]

### c. *"Clean" has implications beyond what Target represents.*

Target argues that the term "clean" has "no common consumer understanding" and using the term does not create "a sufficiently specific promise" or have the capacity to mislead consumers. Def. Br. 19-20.[9] The factual question of the meaning of "clean"

[8] Target places inappropriate reliance on: (1) *Devane v. L'Oreal USA, Inc.,* No. 19 CIV. 4362 (GBD), 2020 WL 5518484, at *4–5 (S.D.N.Y. Sept. 14, 2020) (finding it unreasonable for consumers to presume keratin was an ingredient when it was not on the ingredient list and the product only stated that it helped care for *keratin that is found in hair*); (2) *Workman v. Plum Inc.,* 141 F. Supp. 3d 1032, 1035 (N.D. Cal. 2015) (finding that "[n]o reasonable consumer would expect the size of the flavors pictured on the label to directly correlate to the predominance of the pictured ingredient); (3) *Gitson v. Trader Joe's Co.,* No. 13-cv-01333, 2013 WL 5513711, at *7-8 (N.D. Cal. Oct. 4, 2013) (finding where label stated it was made with Organic Soy Milk, a reasonable consumer would not believe it was cow's milk or had the same properties as cow's milk); and (4) *McKinniss v. Gen. Mills, Inc*., No. 07-cv-2521, 2007 WL 4762172, at *4 (C.D. Cal. Sept. 18, 2007) (finding fruit could be used to demonstrate the "characterizing flavor" where fruit was not an ingredient, particularly where the product stated it was "artificially flavored"). Unlike these cases, Target prominently marketed the Products as part of the Target Clean program with the term "Clean" displayed in a green hexagonal symbol, which directly contradicts the actual nature of the Products.

[9] Defendant cites *Lizama,* 2023 WL 3433957, at *5 to argue it cannot be held liable for representations it allegedly did not make. Def. Br. at 8-9. This argument misrepresents Plaintiffs' allegations. In *Lizama*, plaintiffs argued that H&M had labeled some of its products as the "conscious choice" and this meant they were "environmentally friendly." *Lizama*, 2023 WL 3433957, at *5-6. But, the court found "conscious choice" was clearly defined, and therefore not misleading to consumers. *Id.* (finding the "conscious choice" label was defined as using more sustainable materials than H&M's other products). Unlike *Lizama*, Plaintiffs allege that the Target Clean products directly contradicted the Target Clean criteria.

should not be decided as a matter of law at this stage. Also, labeling beauty products as clean can have, and does have here, implications beyond Target's arbitrary definition.

First, a reasonable consumer's interpretation of the Target Clean Label, and whether those representations equate to "safe and healthy," "green," and "environmentally friendly" claims, is a fact question more appropriately addressed following development of a complete factual record and expert discovery. *See supra* § Argument II(a); *see also LensCrafters*, 943 F. Supp. at 1489 (finding that consumers' reaction to challenged advertising can take the form of direct evidence like testimony or consumer surveys). Thus, the Court should not decide this issue at this stage.

Second, and contrary to Defendant's argument, Plaintiffs allege that marking products "clean" or free from harmful chemicals has meaning to consumers. *See* Compl. ¶¶ 54-62 ("labels and green marketing tactics, like those used by Defendant, impact consumer buying behavior"). There is no meaningful distinction between a label that represents a product as "Target Clean" versus just "clean." *See Jou v. Kimberly-Clark Corp.*, No. 13-cv-03075-JSC, 2013 WL 6491158, at *6 (N.D. Cal. Dec. 10, 2013) (declining to dismiss claims where defendant branded diapers as "pure and natural" and not "all pure and natural" because "[t]he Court [was] not persuaded that, as a matter of law, no reasonable consumer could be deceived"). After all, there is a reason Target created and perpetuated the Target Clean program in the first place.

Target also erroneously analogizes this case to *Jones v. Orgain*, No. 20-CV-8463 (VB), 2021 WL 4392783, at *3–4 (S.D.N.Y. Sept. 24, 2021) and *McAteer v. Target Corp.*, No. 18-349 (DWF/LIB), 2018 WL 3597675, at *4 (D. Minn. July 26, 2018). These cases

are distinguishable. In *Jones v. Orgain, LLC*, plaintiffs alleged that labeling a protein shake as "clean" was misleading because "consumers associate use of the word 'Clean' with products that are 'free from artificial ingredients and other ingredients consumers find undesirable,' such as 'synthetic, artificial ingredients which can have a detrimental effect on health.'" 2021 WL 4392783, at * 1. In considering whether this product's packaging was materially misleading, the court reasoned that the "context was crucial," requiring analysis of the "entire mosaic … rather than each tile separately." *Id.* While examining the context of "Clean" on this individual protein drink's label, the court determined that "clean" exclusively modified the word "protein" and thus, reasonable consumers would not interpret this to mean the entire product was "clean."

Here, Target's application of the Target Clean Label pertained to the entire product as a whole. Target recognizes as much, pointing to the entirety of its ingredient lists on the products as a supposed basis to avoid liability. Thus, unlike *Jones*, Target's representation is not limited to a specific ingredient, but to the entire product, and even more so, to the entire product as compared to products not marked Target Clean. While the *Jones* court found that the representation indicated only "protein" was "clean," here, Target's label creates the impression that the entire Product is clean and better for consumers. Thus, the context in which Target uses the term "clean" is likely to mislead consumers even where the defendants use of "clean" in *Jones* did not.

In *McAteer*, the plaintiff alleged that Target's representations that makeup wipes were "hypoallergenic" and "gently remove makeup" were deceptive and misleading because the wipes caused an adverse skin reaction. 2018 WL 3597675, at *4. Target

claimed the alleged representations were mere "puffery" and unlikely to mislead consumers. *Id.* The court agreed because the representations lacked an "empirical benchmark to provide an indicia of measurability." *Id.*

Here, unlike in *McAteer*, Defendant's "Target Clean" claims are not mere puffery. Indeed, Target expressly represented that certain ingredients and chemicals are excluded from Products labeled Target Clean. Yet, as Plaintiffs allege, the Products contained the Banned Ingredients or ingredients that caused similar impacts to human health. *Id.* ¶¶ 119-20, 124-25, 131-32, 137-38, 143-44, 149-50, 155-56, 161-62, 167-68, 176-77, 182-83, 188-89, 193-94. This is not "mere puffery" and the Court should be unpersuaded by both *Jones* and *McAteer*.

Moreover, there is no meaningful distinction between "clean" and "Target Clean". *Jou v. Kimberly-Clark Corp,* is instructive on this point. There, the court considered the phrase "pure and natural" to be applicable to every ingredient in the product at issue and concluded that any ingredient that was not "pure" or "natural" made those representations false or likely to mislead consumers. The court stated:

> Defendant appears to concede that if the phrase "pure & natural" was modified to include the word "only," "all," or "100%" the consumer could plausibly be misled. . . Whether one labels a product "natural" or "all natural," the same plausible inference can be drawn—that the product is natural, meaning it is not made with any non-natural ingredients. While the use of "all" in "all natural" may make the inference even more plausible than the inference arising from the use of just "natural," the use of "natural" still provides the plausible inference required to defeat a Rule 12(b)(6) motion.

2013 WL 6491158, at *6; *see also see also Janney v. Mills,* 944 F. Supp. 2d 806, 809 (N.D. Cal. 2013) (analyzing the phrases "100% Natural," "All Natural," and "Natural"

interchangeably in denying defendant's motion to dismiss). Here, as in *Jou*, the distinction between a product labeled "Target Clean"—which Defendant contends makes the "clean" representation conditional on Target's definition—and "Clean" is immaterial. Both representations convey to reasonable consumers that the Identified Products contained "clean" ingredients, excluded unwanted ingredients, and were healthier for consumers. Also, both "clean" and "Target Clean" were plainly deceptive as to the Identified Products that actually contained ingredients with an unwanted impact on human health and the environment. No reasonable consumer seeks to put a known carcinogen, in powder form, directly on their face. Nor do they expect a product marketed as "clean" or "Target Clean" to put them in such a position, as Plaintiffs allege.

The Court should reject Target's argument that the Target Clean Label could not be interpreted by consumers to mean the Products were overall clean and free from unwanted or harmful ingredients, and the Court should deny Defendant's Motion.

**C. Target's Greenwashing is also relevant here.**

Plaintiffs' Complaint references the FTC's "Guides for the Use of Environmental Marketing Claims," codified at 16 C.F.R. 260.1, *et seq*. ("Green Guides"), which fully support their claims. The Green Guides help marketers avoid making claims that are unfair or deceptive based on the FTC's "views on how reasonable consumers likely interpret [those] claims." *Id.* at § 260.1(a), (d); *see also White v. Kroger Co.,* No. 21-CV-08004-RS, 2022 WL 888657, at *2 (N.D. Cal. Mar. 25, 2022). According to the Green Guides, it is deceptive to represent that a product is free of a substance, even where that statement may be true, if the product contains or uses substances that pose the same or similar risks as the

substance that is not present. 16 C.F.R. § 260.3; *see also* Compl. ¶ 52(g). The Green Guides also state that companies "should not imply that any specific benefit is significant if it is, in fact, negligible. *Id.* at § 260.4(c). As Plaintiffs alleged, Target violated both of these FTC-mandated principles.

Target represented that all "Target Clean" products were free of the Banned Ingredients and failed to disclose certain products contained either those very Banned Ingredients or others that posed similar risks. Compl. ¶¶ 1, 119, 124, 131, 137, 143, 149, 155, 161, 167, 176, 182, 188, 193, 221. According to the Green Guides, this is deceptive. Compl. ¶ 52(g). Defendant also implied that it takes the work out of finding cleaner products on consumers' behalf and that the Target Clean products were distinguishable from non-marked products because they exclude unwanted ingredients and were purportedly safer for consumers. *See, e.g.,* Compl. ¶¶ 106-07. As Plaintiffs alleged, that is false and also violated the Green Guides.

Target now asserts that, regardless of its Target Clean Label, consumers still need to review all its products' ingredients to determine if they are actually clean and free from unwanted chemicals. This undoes the supposed value of the Target Clean program in its entirety, indicating that Target is seeking to represent itself as "clean" to solicit customers without actually providing a benefit to consumers. The Green Guides deem this conduct to be deceptive. 16 C.F.R. §269.4(c) (finding companies should not represent benefits as substantial if they are negligible or nonexistent). Thus, the Green Guides support Plaintiffs' allegations that Defendant's use of the Target Clean label and its other statements related to the Target Clean program were deceptive and likely to mislead consumers.

### D. Plaintiffs alleged Target made actionable misrepresentations and omissions.

The spectrum for liability for deceptive acts or practices spans from affirmative misrepresentations[10] to omissions, including advertisements containing half-truths, or that may be literally true but still create an overall misleading impression through the failure to disclosure material information. *See Graphic Commc'ns.,* 850 N.W.2d at 695 (MCFA applied to conduct "that tend[ed] to deceive or mislead a person," including affirmative misrepresentations or material omissions); *M.H. v. Caritas Family Servs.,* 488 N.W.2d 282, 289 (Minn. 1992) ("A misrepresentation may be made either (1) by an affirmative statement that is itself false or (2) by concealing or not disclosing certain facts that render the facts that are disclosed misleading.").

Plaintiffs' claims are based on both Target's affirmative misrepresentations and its omissions, and Plaintiff has sufficiently pled causes of action thereon, including the elements of intent and reliance (if they are required at all).

#### 1. Plaintiffs alleged Target omitted material facts, which is actionable.

Plaintiffs sufficiently alleged that Target omitted material facts related to the Target Clean program. An omission, or nondisclosure, is the failure to disclose a fact that one knows may justifiably induce the other to act or refrain from acting in a transaction. *Tomasella*, 962 F.3d at 71. Under Minnesota law, "for an omission to be actionable, it must be material to the transaction, and the party concealing the fact must have been under a

[10] *See supra* for a full discussion on Target's affirmative misrepresentations.

legal or equitable obligation to communicate the fact to the other party." *Graphic Commc'ns,* 850 N.W.2d at 695 (internal citations omitted). Plaintiffs sufficiently pled both requirements.

**a. *Target omitted material facts to consumers.***

As alleged, Target omitted material facts related to the Identified Products when it labeled them "Target Clean," but failed to also disclose that the Identified Products contained Banned Ingredients, other ingredients posing a similar risk, or both. Consumer fraud claims can be based on a material omission that renders a sales transaction deceptive or misleading. *See Khoday v. Symantec Corp.,* 858 F. Supp. 2d 1004, 1018 (D. Minn. 2012) (stating the CFA is "broader than common law fraud and support[s] omissions as violations when they are material and naturally affect consumers' conduct"). Material in this context simply means the omission must naturally affect a person's decision or conduct. *Yost v. Millhouse,* 373 N.W.2d 826, 830 (Minn. Ct. App. 1985).

Target's prominent use of the Target Clean label and simultaneous failure to disclose the actual nature of the ingredients in the Identified Products was a material omission of fact. Plaintiffs alleged that they specifically sought out "clean" beauty products and the Target Clean Label impacted their decision to purchase the Identified Products. Compl. ¶¶ 21-34. Plaintiffs further alleged that had they known the Identified Products contained unwanted ingredients, they would not have purchased the Identified Products or made the purchases under different terms. *Id.* These facts establish that Target's omission were material to the sale transaction at issue.

**b. *Target's omissions of material facts are actionable deceptive practices.***

Target's omission of material facts was also a deceptive practice. Violative deceptive practices include a broad range of "deceitful conduct in connection with the sale of merchandise." *Graphic Commc'ns*, 850 N.W.2d at 694. Deceptive practices have been found to encompass any conduct that tends to deceive. *Id.* at 694-95. As Plaintiffs alleged, the Target Clean Label tended to, and did in fact, deceive consumers.

Target's failure to disclose that its prominently marked "Target Clean" products contained unwanted or harmful ingredients constituted a deceptive practice. *See Force v. ITT Hartford Life Ins. & Annuity Ins. Co.*, 4 F. Supp. 2d 843, 859 (D. Minn. 1998) ("[G]iven that the fertility of human invention in devising new schemes of fraud, the CFA could not possibly enumerate all, or even most, of the areas and practices that it covers without severely retarding its broad remedial power to root out fraud in its myriad, nefarious manifestations."); *see also St. Paul Fire & Marine Ins. Co. v. Ellis & Ellis*, 262 F.3d 53, 66 (1st Cir. 2001) (standard of conduct under Massachusetts' Unfair Trade Practices Act is "notably imprecise" and includes any conduct possessing a "rancid flavor of unfairness"); *Zanakis-Pico v. Cutter Dodge Inc.*, 47 P.23d 1222, 1230 (Haw. 2002) (consumer protection statutes are "constructed in broad language in order to constitute a flexible tool to stop and prevent fraudulent, unfair, or deceptive business practices for the protection of both consumers and honest business men"); *Clement v. St. Charles Nissan Inc.*, 103 S.W.3d 898, 900 (Mo. Ct. App. 2003) (consumer protection statute omitted definition of deceptive practices deliberately "in order to prevent evasion by overly

meticulous definitions"). Additionally, representing the Target Clean Label as a time-saving tool to make shopping for clean products easy was deceptive because, by Target's own admission, it simultaneously expected consumers to fully scrutinize and research the entire contents of the ingredient list. Compl. ¶¶ 106-07. Indeed, this representation induced consumers to select the Products without doing their own analysis, per Target's representation that it already evaluated the Identified Products. As Plaintiffs pervasively alleged, this conduct tended to deceive consumers. Plaintiffs sufficiently alleged Target's omissions of material facts were deceptive practices.

**c. *Special circumstances exist that triggered Target's duty to disclose all material facts related to the Target Clean Label.***

Target had a duty to disclose that the Identified Products may contain unwanted ingredients that pose similar risks as those that are banned from Target Clean beauty products. Special circumstances that trigger such a legal or equitable duty exist in three circumstances: (1) when there is a confidential or fiduciary relationship between the parties; (2) when one party has "special knowledge of material facts to which the other party does not have access; and (3) when a party's representations would be misleading absent additional disclosures. *Song*, 2020 WL 7624861, at *11.

Both the second and third circumstances certainly apply here because the Target Clean Label, and Target's representations made in conjunction with that label on the Identified Products, only tell part of the story, or are half-truths based on Target's own knowledge. *See Klein v. First Edina Nat. Bank*, 293 Minn. 418, 421 (Minn. 1972) (examining situations where "special circumstances" exist and finding "[o]ne who speaks

must say enough to prevent his words from misleading the other party.”).[11] Indeed, the Minnesota Supreme Court has held:

> Though one may be under no duty to speak as to a matter, if he undertakes to do so, either voluntarily or in response to inquiries, *he is bound not only to state truly what he tells, but also not to suppress or conceal any facts within his knowledge which materially qualify those stated. If he speaks at all, he must make a full and fair disclosure.*

*Swedeen v. Swedeen*, 270 Minn. 491, 500 (1965) (emphasis in original).

Target voluntarily created the Target Clean Label and applied it to the Identified Products, thereby stamping the Identified Products as “clean” and formulated without “unwanted” ingredients. This created the impression the Identified Products were actually free from certain ingredients and the risks associated with those ingredients. The impression created by Target’s representations triggered a duty to disclose the rest of the material facts in Target’s knowledge, including the presence of ingredients both on the Banned Ingredients list and others with similar risks to human health and the environment.

Of course, Target was under no obligation to make any representations about the Identified Products in the first place, but it chose, for business reasons, to label products “Target Clean”, presumably to tap into the growing and already large consumer demand for clean products. Compl. ¶¶ 2, 107-08, 299, 393. Once it spoke, however, it was under an obligation not to disclose only “half-truths”. *See Newell v. Randall* 32 Minn. 171, 173

[11] In *Song*, the court found that the third circumstance did not apply to plaintiffs’ omission-based claims because defendant’s packaging statements were not deceptive or misleading, and thus none required corrective disclosures. 2020 WL 7624861, at *11. As argued above, *Song*’s finding on deceptive and misleading statements is factually distinguishable from this case, and, thus, so isits conclusion regarding the existence special circumstances.

(Minn. 1884) (having assumed to answer plaintiff's inquiry, defendant was not at liberty to make an evasive and partial statement, which although literally true contained only half the truth and was calculated to mislead and convey a false impression); *see also In the Matter of Int'l Harvester Co.*, 104 F.T.C. 949, at 1058 (F.T.C. 2008) (*citing Ward Labs. V. FTC*, 276 F.2d 952 (2nd Cir. 1960)); *Keele Hair & Scalp Specialists*, 55 F.T.C. 1840 (F.T.C. 1959), *aff'd*, 275 F.2d 18 (5th Cir. 1960) (explaining that a "half-truth" would include, for example, an advertisement that a product can cure baldness, but failing to disclose that most baldness is heredity and cannot be treated).

Target's use of the Target Clean label was a "half-truth" because it represented that the Identified Products were clean, formulated without unwanted ingredients, better for consumers, and held to a higher standard of clean when they were not. Target, thus, had an obligation to correct its misleading label. It did not do so, instead arguing that customers should have performed their own investigation to determine whether the Target Clean products were actually safe. Target's omissions are, therefore, actionable.

**2. Target intentionally made affirmative misrepresentations and omitted material facts related to the Target Clean Label.**

Plaintiff has sufficiently alleged Target acted intentionally to deceive consumers and any claim requiring a showing of intent should survive on that basis. Compl. ¶¶ 2, 173, 220, 226, 243, 255–56, 272–73, 284–85, 304, 313, 321, 342–43. At this stage, intent

may be alleged generally. *Bhatia,* 323 F. Supp. 3d at 1094-95 (D. Minn. 2018). Plaintiffs satisfied the general standard for intent.[12]

Plaintiffs fully allege that Target *intentionally* marketed the Target Clean program as a way for consumers to simplify shopping for clean products while simultaneously neglecting to inform consumers that Target Clean products were not comprehensively evaluated, but rather, scanned (and in some cases negligently scanned) for a few bad ingredients. *Id.* ¶¶ 105-07, 170–72. Defendant made these representations based on a narrow analysis of a few known-to-be harmful ingredients, and not an evaluation of all the ingredients in the Identified Products. Plaintiffs alleged Defendant did this intentionally because disclosing to consumers that only a few ingredients were evaluated would mean consumers still had to individually analyze the products to determine if they were "clean", and the process would be no simpler than if Target Clean did not exist.

In reality, the Target Clean Products were not "clean," formulated without "unwanted" chemicals" or "better-for" consumers when their ingredients lists were

[12] As a plea for dismissal based on Plaintiff's supposed failure to plead intent, Defendant cites (1) *Ablaza v. Sanofi-Aventis U.S. LLC*, No. 21-cv-01942, 2022 WL 19517298, at *5 (N.D. Cal. July 12, 2022) (finding plaintiff had only pled conclusory facts related to intent); (2) *Lizama*, 2023 WL 3433957, at *7 (lacking an express finding on intent but concluding the "conscious choice" label was supported because it was defined to mean using more sustainable materials than other products and the retailer explained why certain materials were preferable to others and the environmental impacts of each); and (3) *Bhatia*, 323 F. Supp. 3d at 1094-95 (finding general allegations related to a marketing campaign could not demonstrate intent because plaintiffs failed to demonstrate "how 3M had intent to induce"). These are all distinguishable. Here, Target induced consumers to use the Target Clean Label by proclaiming it to be a way to make shopping for clean products easy. Compl. ¶¶ 105-07. At the same time, it intentionally did not tell consumers that they still needed to review and research the entirety of the Products' ingredients to determine whether the Products conformed to the "clean" proclamation.

reviewed in whole. *Id.* ¶¶ 1, 119, 124, 131, 137, 143, 149, 155, 161, 167, 176, 182, 188, 193, 221. Moreover, Target itself did nothing to make any products carrying the Target Clean Label cleaner. Target doesn't change the ingredients manufacturers put into their products and the majority of the Identified Products are not labeled "clean" by the manufacturers themselves. Rather, Target merely invented the program to tap into the demand for "clean" products by purporting to simplify shopping for consumers looking for "clean" products. Compl. ¶¶ 2, 106-107, 321. The Target Clean program, thus, benefited only Target.

In short, Target Clean was a way for Target to get consumers in their doors under the ruse of simplified "clean" shopping. Target then proceeded to defend this action by claiming that consumers confused by the Target Clean Label could have reviewed, researched, and analyzed the entirety of the Identified Products' labels on their own—the exact task the Target Clean program sought to assuage consumers to leave to Target. Def. Br. 17. At any rate, Target's intent was to get consumers shopping in their stores, and in this case that included deceiving them about the Target Clean program and its benefits.

**3. Plaintiffs are not required to allege individual reliance.**

Target argues that Plaintiffs have not sufficiently pled reliance on Target's misrepresentations or omissions. In doing so, Target overlooks both the law and Plaintiffs' plain allegations. *See Suchanek v. Sturm Foods, Inc.,* 764 F.3d 750, 758 (7th Cir. 2014) (finding whether packaging was likely to mislead a reasonable consumer is common to the claims of every class member and is an objective question, not one that depends on each

purchaser's subjective understanding of the package). Thus, Target's arguments should fail.

Plaintiffs are not required to demonstrate proof of individual reliance for their affirmative misrepresentation or omission-based claims. *State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 134–35 (Minn. 2019); *Norwest Bank Midland v. Shinnick,* 402 N.W.2d 818, 825 (Minn.App.1987) (recognizing a "presumption of reliance" in cases involving omissions); *see also Austin v. Loftsgaarden,* 675 F.2d 168, 178 n. 21 (8th Cir.1982) (similar). Instead, "plaintiffs need only establish a causal nexus between the conduct alleged to violate the MCFA [or the MDTPA] and the damages claimed." *Id.* "This is particularly true 'where a defendant's misrepresentations were directed at and affected a broad group of consumers,'" and plaintiffs in such cases do not need to offer "'proof of direct individual reliance'" to establish that causal nexus. *Sch. of Bus.*, 402 N.W.2d at 135 (quoting *Grp. Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2, 14–15 (Minn. 2001)). Indeed, a plaintiff alleging injury based on the purchase of a mass-market product can establish standing by pleading facts showing a defendant's violative, systemic practices regarding the product. *See, e.g., John v. Whole Foods Market Group, Inc.,* 858 F.3d 732, 734, 737-38 (2d Cir. 2017).

Here, Plaintiffs alleged Target uniformly stamped the Identified Products with the Target Clean Label (along with thousands of other products), both in-stores and online. Compl. ¶¶ 21-35, 105. This is sufficient to establish that Target directed representations at a broad group of consumers and establishes a causal nexus in lieu of any reliance. *See Sch. of Bus.*, 402 N.W.2d at 135 (holding that a causal nexus may exist where the defendants'

misrepresentations were directed at a broad group of consumers). Additionally, Plaintiffs allege Target omitted material facts, including that consumers should still fully review and research the Identified Products' labels to determine if they were actually clean. These omissions create a presumption of reliance.

Notwithstanding this, Plaintiffs plainly allege that the Target Clean Label impacted their decision to purchase the Identified Products, and that they would not have purchased those products, or would have purchased the products under different terms, had they known they contained unwanted or harmful ingredients. Compl. ¶¶ 21-34; *see also Knotts v. Nissan N. Am., Inc.,* 346 F. Supp. 3d 1310, 1325 (D. Minn. 2018) (finding reliance satisfied where plaintiff relied on defendant's misrepresentations, or he would not have purchased his vehicle). Thus, Plaintiffs sufficiently alleged any reliance the law may require. Taken together, Plaintiffs alleged reliance and causation sufficient for all of their consumer fraud and deception-based claims and the claims should proceed.

## III. PLAINTIFFS HAVE SUFFICIENTLY PLED THEIR STATE STATUTORY CLAIMS.

### A. Plaintiffs Sufficiently Allege Causation under the Washington Consumer Protection Act.

A claim under Washington's Consumer Protection Act ("WCPA") requires a plaintiff to establish: "(1) an unfair or deceptive act or practice; (2) that occurs in trade or commerce; (3) a public interest; (4) injury to the plaintiff in his or her business or property; and (5) a causal link between the unfair or deceptive act and the injury suffered." *Poole v. Benjamin Moore & Co.*, No. C18-5168-RBL, 2018 WL 2716806, at * (W.D. Wash. June 6, 2018).

Defendant only challenges the fifth element, causation. Though Defendant acknowledges that actual reliance is not required to establish, let alone plead, a WCPA claim, it still seeks to hold Plaintiffs to that exacting standard at this early stage of litigation. *See Poole*, No. C18-5168-RBL, 2018 WL 2716806, at *3 (finding defendant's "lack of causation" argument to be the "functional equivalent" of a "lack of reliance" argument and denying defendant's motion to dismiss). Defendant's arguments are merely an attempt to require Plaintiffs to allege actual reliance, demonstrated most clearly through Defendant's critique that "Plaintiffs Solmssen and Brodiski do not allege they *actually read and relied* upon Target's explanation that the Target Clean products lack propylparabens." Def. Br. 27 (emphasis added).

Notwithstanding Defendant's misconstruction of the requirements to plead a WCPA claim, Plaintiffs have clearly and sufficiently plead a causal link between Defendant's conduct and their injuries. Specifically, Plaintiffs alleged, "Plaintiff[s] and the Washington Subclass have suffered injury in fact and have lost money as a result of Defendant's unfair conduct. Plaintiff[s] and the Class paid an unwarranted premium for these Identified Products, or otherwise bargained for a product they did not receive." Compl. ¶ 455. Plaintiffs further allege, "Plaintiff[s] and the Class would not have purchased the Identified Products, would have paid substantially less for the Identified Products, or purchased the Identified Products under different terms if they had known that the Identified Products' advertising and labeling were deceptive." *Id.* Plaintiffs Solmssen and Brodiski additionally allege they each "tr[y] to purchase clean products" when they can and that the Target Clean Label on the purchased products "impacted [their] decision to purchase the

product." *Id.* ¶¶ 33–34. Both "would not have purchased the product, or would have purchased the product under different terms, had [they] known the [product] contained unwanted or harmful ingredients." *Id.* In short, Plaintiffs sufficiently allege causation. *See Poole*, No. C18-5168-RBL, 2018, WL 2716806, at *3 (denying dismissal of a WCPA claim where plaintiffs sufficiently plead causation through awareness of the allegedly deceptive representations and overpayment for products that fail to conform to such representations).

### B. Plaintiffs Sufficiently Allege Both Fraudulent Conduct and Underlying Predicate Offenses in Violation of the California Unfair Competition Law.

Target argues, incorrectly, that Plaintiffs' claim for a violation of the California Unfair Competition Law ("UCL") must fail because for failure to plead with particularity under Rule 9(b) or unlawful or unfair conduct, as predicated on the California False Advertising Law ("FAL"), and the Consumer Legal Remedies Act ("CLRA"). These arguments fail. As Plaintiffs detailed above, Plaintiffs allege that Target acted fraudulently and also that Target made affirmative misrepresentations and omitted material facts in violation of the FAL and CLRA. These allegations likewise satisfy the unlawful and unfair prongs of the UCL.

The California Unfair Competition Law UCL protects consumers against misrepresentations, omissions, and deceptive unlawful conduct. *See* Cal. Bus. & Prof. Code § 17200. Plaintiffs have alleged violations of the UCL under each of the three prongs – the "fraudulent," "unfair," and "unlawful" prongs. Compl. ¶¶ 288–305. As discussed above, Plaintiffs allege specific facts that demonstrate Target's use of the Target Clean Label was deceptive because it involved both actionable misrepresentations and omissions

and consumers were likely to be deceived. These allegations are sufficient to satisfy Rule 9(b) and to plead Plaintiffs' California claims.

Defendant does not argue that there are any specific deficiencies in Plaintiffs' UCL claims, but instead avers that Plaintiffs' FAL' and CLRA claims fail, and thus, the "bootstrapped" UCL claims also fail. Contrary to Target's arguments, in meeting the requirements under the heightened Rule 9(b) standard, Plaintiffs have also adequately plead predicate offenses under the FAL and CLRA, and Plaintiffs have also sufficiently pled a violation of the UCL's "unlawful" prong. Lastly, because Plaintiffs have sufficiently pled both violations of the "fraudulent" and "unlawful" prongs of the UCL, dismissal of their "unfair" prong claims is inappropriate. The motion should be denied.

### C. Plaintiffs' Alabama Deceptive Trade Practices Act and Arizona Consumer Fraud Act Claims Are Timely.

At the outset, a statute of limitations defense is an affirmative defense, which a plaintiff need not plead. Moreover, claims under the Alabama Deceptive Trade Practices Act ("ADTPA") and the Arizona Consumer Fraud Act ("ACFA") must be brought within one year after "the person bringing the action discovers or reasonably should have discovered the act or practice which is the subject of the action." Ala. Code § 8-19-14; *see also Frazer v. Millennium Bank, N.A.*, No. 2:10-cv-01509-JWS, 2010 WL 4579799, at *2-4 (D. Ariz. Oct. 27, 2010) (discussing the discovery rule's similar application to ACFA claims). However, it is "well-settled Alabama law" that "the question of when a plaintiff should have discovered the fraud should be taken away from the jury and decided as a matter of law only in cases where the plaintiff *actually knew* of facts that would have put a

reasonable person on notice of fraud." *Jones v. Coty Inc.*, 362 F. Supp. 3d 1182, 1212 (S.D. Ala. Sept. 14, 2018) (emphasis in original). Similarly, "the Arizona Supreme Court has explained, 'determinations of the time when discovery occurs and a cause of action accrues are usually and necessarily questions of fact for the jury." *Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 826 (D. Ariz. 2016). "[A] plaintiff's allegations about the date of discovery must be accepted as true at the 12(b)(6) stage, and a claim should not be dismissed as untimely unless the running of the statute of limitations is apparent on the face of the complaint." *Id.* (internal quotation omitted).

Here, Plaintiffs allege that they were not aware of the deceptive and fraudulent nature of Defendant's representations using the Target Clean program at the time of purchase. Compl. ¶¶ 21–22. They alleged that had they known, they would not have purchased the Identified Products or would have done so under different terms. *Id.* Thus, neither Plaintiff Boyd nor Plaintiff Camacho had sufficient notice on the date of purchase to initiate the start of the applicable statute of limitations.

Further, Target cannot establish, as a matter of law, that Plaintiffs had sufficient knowledge or information that their causes of action accrued prior to August 29, 2022 (one year prior to the initiation of this action). The mere purchase of a product, even with knowledge that the product causes adverse reactions, is insufficient to confer the necessary knowledge to initiate the accrual of the statute of limitations on an ADTPA claim. *Jones*, 362 F. Supp. 3d at 1213. Similarly, the fact that information exists within the public domain that could alert a consumer to potential fraud or deceptive practices does not initiate the

running of the statute of limitations under the ACFA. *See Cheatham*, 161 F. Supp 3d at 826.

The idea that a reasonable person would be required, as a matter of law, to research each and every ingredient within a product to verify a company's claims that such ingredients are "clean" undermines the very existence of Defendant's Target Clean program. The program itself assures consumers it need not conduct such research, as Target states the Target Clean Label is meant to remove the hassle of researching products from consumers' shoulders. In short, it is inappropriate at this early juncture to take from the jury, and decide as a matter of law, the question of when Plaintiffs discovered Defendant's deception.

## IV. PLAINTIFFS SUFFICIENTLY ALLEGE BREACH OF EXPRESS AND IMPLIED WARRANTY CLAIMS.

Plaintiffs have sufficiently alleged breaches of both express and implied warranties. "A claim for breach of warranty requires a plaintiff to show (1) the existence of a warranty, (2) breach of the warranty, and (3) a causal link between the breach and the alleged harm." *McGregor v. Uponor, Inc.*, No. 09-1136 ADM/JJK, 2010 WL 55985, at *8 (D. Minn. Jan. 4, 2010). Defendant first generically asserts that the same deceptive acts and omissions underlie Plaintiffs' misrepresentation, fraud, and state statutory claims, and therefore, if those claims fail, then so do Plaintiffs' breach of warranty claims. For the reasons set forth in each respective section above addressing these specific claims, dismissal on this ground is unwarranted. Defendant further contends that Plaintiffs have not sufficiently alleged an actionable affirmation of fact that created a warranty or causation. That argument fails.

### A. Plaintiffs' sufficiently alleged Target's affirmative representations, which gave rise to warranties.

First, Plaintiffs have sufficiently pled the existence of a warranty. "An express warranty is created when a seller makes any affirmation of fact or promise . . . to the buyer which relates to the goods and becomes part of the basis of the bargain." *Id*. (internal quotations omitted). "The word 'warranty' need not be used so long as a clear representation of the quality of a thing sold is made by a seller to the buyer as part of a contract for sale and the buyer relied upon the statement." *Id.* Lastly, "statements in advertising can give rise to an express warranty." *Id.*

Plaintiffs allege at length the affirmations of fact made by Defendant through its Target Clean program, noting that the Target stated: "(1) products marked "Target Clean" do not contain any of the Banned Ingredients even though some of the products do contain these exact ingredients; (2) products formulated without the Banned Ingredients are in fact clean despite the presence of other equally or more harmful ingredients in the products; and (3) the presence of these ingredients at <100 ppm is a safe amount for consumer exposure, even though exposure to some of these ingredients and other forever chemicals are dangerous at much smaller consistencies." Compl. ¶ 5. Furthermore, Target instructed consumers to "[l]ook for the Target Clean symbol in store [and] online to find brands that meet [Target's] higher standard of clean." Compl. ¶ 105. Target meant for the Target Clean Label to inform consumers that a product is "formulated without a group of commonly unwanted chemicals." *Id.* Each Plaintiff relied upon these affirmations of fact when deciding to purchase the products identified as "Target Clean," and as such, those

affirmations became part of the basis of each Plaintiff's bargain. Compl. ¶¶ 21–34. Defendant has not and cannot explain how labeling a product as "Target Clean" is anything other than an affirmation of fact or promise that the product conforms to the Target Clean criteria and is made without unwanted, "unclean" chemicals.

Furthermore, this case is distinguishable from *Chin v. General Mills, Inc.* where the specific disclosures on the ingredient list of the single product at issue limited the defendant's "100% Natural" claim. No. 12-2150 (MJD/TNL), 2013 WL 2420455, at *5 (D. Minn. May 31, 2013). In the present case, Defendant has purported to take the initiative of performing the cleanliness analysis itself and warranted to consumers that the products featuring the Target Clean Label met specific criteria and did not contain unwanted chemicals. Compl. ¶¶ 2–9, 105–07. As Plaintiffs allege, the premise of the Target Clean program was built upon an understanding that the reasonable consumer cannot be expected to discern the safety and cleanliness of each ingredient within the thousands of products marked as Target Clean, but instead that such consumers should rely upon Defendant's representations. *Id.* ¶¶ 105-07.

**B. Plaintiffs sufficiently alleged causation.**

Plaintiffs also sufficiently allege a causal link between Target's breach warranty and the alleged harm. Plaintiffs clearly alleged that they tried to purchase clean products and that the Target Clean Label impacted their decision to purchase the Identified Products, and Target Clean Label constituted part of "the basis of [their] bargain." Compl. ¶¶ 21–34; *see* Minn. Stat. § 336.2-313(1). Had Plaintiffs known that the Identified Products did not conform to the affirmations made through the Target Clean Label, they would not have

purchased the product or would have done so under different terms. Compl. ¶¶ 21–34. As detailed above, the Target Clean Label is not meaningless, as Defendant seems to now aver. Further, Defendant applied this label to individual products on a product-by-product basis. Compl. ¶¶ 117–96. Such affirmations are clearly "part of the description of the goods," and when relied upon to the consumer's detriment, a causal link is established between the false and deceptive affirmations, causing Plaintiffs harm.

Plaintiffs' warranty claims should proceed.

## V. PLAINTIFFS SUFFICIENTLY ALLEGED TARGET'S UNJUST ENRICHMENT.

Defendant argues that Plaintiffs' unjust enrichment claim should be dismissed for three reasons. First, Defendant argues that Plaintiffs have not pled their claim with sufficient detail. Second, Defendant argues that Plaintiffs have an adequate remedy at law. Third, Defendant argues that Plaintiffs cannot plead unjust enrichment as an alternative form of relief. Each argument should fail.

First, Plaintiffs sufficiently allege facts to establish a claim for unjust enrichment. To state such a claim under Minnesota law, a plaintiff must allege "that another party knowingly received something of value to which he was not entitled, and that the circumstances are such that it would be unjust for that person to retain the benefit." *Cobb v. PayLease LLC*, 34 F. Supp. 3d 976, 989 (D. Minn. 2014) (internal quotation marks omitted). Plaintiffs alleged they paid Defendant for the Identified Products with the Target Clean Label, Compl. ¶¶ 21-34, and that Defendant knowingly used the label on the Identified Products even though they contained unwanted chemicals, and in many cases,

where not described by the manufacturers *themselves* as "clean". Compl. ¶ 13. For each of the Identified Products, Plaintiffs describe the specific ingredients that contributed to Defendant's deception. *See* Compl. ¶¶ 119-121, 125-127, 131-133, 137-140, 143-146, 149-152, 155-158, 161-164, 168-169, 173, 176-179, 182-185, 188-191, 193-195 (specifically alleging the "unclean or harmful ingredients" contained in the Target Clean products). Plaintiffs also allege that the Target Clean Label was "designed to take the complications out of finding better-for-you product options." Compl. ¶ 107. The Complaint specifically described how the Target Clean Label fits into Defendant's broader goals with respect to chemical claims, which Defendant described as its "Wellness Icon Gallery" meant "to make wellness 'simple' for consumers" by taking the need for independent research and analysis out of the transaction. Compl. ¶ 109. "By labeling each of the [Target Clean products] as 'clean' and free from 'unwanted' ingredients, Target is misleading consumers as to the 'clean'-ness of the Target Clean Identified Products and greenwashing Target consumers." Compl. ¶ 196. Plaintiffs sufficiently alleged a claim for unjust enrichment.

Defendant's next argument—that there exists an adequate legal remedy—fails because the availability of legal remedies is insufficient to defeat an unjust enrichment claim. "In Minnesota, a party may not have equitable relief where there is an *adequate* remedy at law available." *United States v. Bame*, 721 F.3d 1025, 1030 (8th Cir. 2013) (citing *ServiceMaster of St. Cloud v. GAB Bus. Servs., Inc.*, 544 N.W.2d 302, 305 (Minn. 1996) (emphasis added)). An equitable claim of unjust enrichment is proper here because the state-specific legal relief sought in various Sub-Class claims is not commensurate with

the harm alleged. The cases Defendant cites stand for the proposition that equitable relief is unavailable when the plaintiff could seek "the same relief" through other legal remedies. *Huff v. Pinstripes, Inc.*, 927 F. Supp. 2d 1065, 1083 (D. Minn. 2013); *see also ServiceMaster*, 544 N.W.2d at 305-06 (contractor who has statutory mechanisms to ensure payment cannot seek equitable relief to recover payment). Plaintiffs' legal remedy of actual damages is a distinct remedy from that of unjust enrichment remedy, seeking a "return of all monies Defendant acquired from its unlawful conduct." Compl. ¶ 234. Thus, the rules of these cases do not bar Plaintiffs' claim for equitable relief because Plaintiffs seek a different remedy.

Lastly, Defendant is incorrect to argue that Minnesota law precludes the pleading of unjust enrichment in the alternative. Courts in this District routinely decline to dismiss unjust enrichment claims because Federal Rule of Civil Procedure 8(d)(2)(3) expressly permits parties to plead alternative claims. *Gisairo v. Lenovo (United States) Inc.*, 516 F. Supp. 3d 880, 893 (D. Minn. 2021) (citing cases). The lone case upon which Defendant relies involved an unjust enrichment claim that was "entirely duplicative of the breach-of-contract claim." *Moreno v. Wells Fargo Bank, N.A.*, 18-CV-2760 (PJS/DTS), 2019 WL 1438248, at *7 (D. Minn. Apr. 1, 2019). In *Moreno* the court dismissed the unjust enrichment claim because it depended on the parties' contract being unenforceable and the plaintiff failed to allege any facts about the enforceability of the contract. *Id.* Plaintiffs respectfully submit that such a holding is antithetical to alternative pleading, which is expressly allowed. In the event, if Plaintiffs' contract claims (*i.e.*, their warranty claims) fail, unjust enrichment is an entirely appropriate alternative claim. Plaintiffs need not

allege *both* that they are entitled to recover under contract and that such contract is unenforceable. Plaintiffs have adequately pleaded the claim for unjust enrichment, seeking relief that is distinct from the other requests for relief.

For all these reasons, Plaintiffs' unjust enrichment claim should proceed.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Motion in its entirety.[13]

Respectfully submitted,

Dated: December 4, 2023

*/s/ Brian C. Gudmundson*
Brian C. Gudmundson, MN Bar No. 336695
Rachel K. Tack, MN Bar No. 399529
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
rachel.tack@zimmreed.com

Christopher D. Jennings (*Pro hac vice*)
Tyler B. Ewigleben (*Pro hac vice*)
**JOHNSON FIRM**
610 President Clinton Avenue, Suite 300
Little Rock, Arkansas 72201
Telephone: (501) 372-1300
chris@yourattorney.com
tyler@yourattorney.com

[13] If the Court determines the pleadings are deficient in any respect, Plaintiffs request leave to amend to cure any such deficiencies. Fed. R. Civ. P. 15(a)(2).